OPINION
{¶ 1} Appellant, Pineview Manor, Inc., appeals from a judgment of the Franklin County Court of Common Pleas affirming an order of appellee, the Ohio Department of Health, which found that appellant had violated a quality of care requirement and assessed a civil monetary penalty against appellant. Because the trial court did not abuse its discretion in finding that appellee's order was supported by reliable, probative and substantial evidence, we affirm that judgment.
 {¶ 2} Appellant operates a 50-bed nursing facility located in Beaver, Ohio. Appellee licenses and regulates nursing facilities. Pursuant to R.C. 5111.39(A), appellee must conduct a "standard" survey of every nursing facility in the state once every 12 to 15 months to ensure that such facilities are in compliance with state and federal laws and certification requirements. As a participant in the federal Medicaid program, appellant's facility also must be in substantial compliance with the program requirements found in Section 483, Title 42, C.F.R.
 {¶ 3} On January 21, 2000, a team of nurses conducted a standard survey of appellant's facility. During that survey, the team found 18 instances of non-compliance with state and federal laws and regulations, known as deficiencies. The team prepared a written statement describing these deficiencies. The deficiency at issue in this appeal was labeled "Tag F314" and alleged that appellant violated a quality of care requirement by failing to prevent the development of an avoidable pressure sore on a resident who entered the facility without pressure sores. See Section 483.25(c), Title 42, C.F.R.
 {¶ 4} As a result of this deficiency, appellee imposed a civil monetary penalty ("CMP") of $350 per day, effective January 21, 2000, until appellant substantially corrected the deficiency. Thereafter, appellee conducted a follow-up survey of the facility and determined that appellant had substantially corrected the deficiency as of February 18, 2000. Therefore, appellee imposed a CMP of $9,800.
 {¶ 5} Pursuant to appellant's request, a hearing was held on December 18 and 19, 2000, to address the deficiency finding and the CMP. Beverly Logan, the coordinator of the team of nurses who conducted the January 21st survey, testified on behalf of appellee. She stated that deficiencies are measured in terms of their scope and severity. The scope of the deficiency can range from an isolated incident to a more widespread problem. Likewise, a deficiency may have only minimal impact on a patient or it may place a patient in immediate jeopardy. Logan's survey team recommended the Tag F314 as a level "G" deficiency, indicating the violation caused actual harm to the resident, but that the scope of the violation was isolated and did not affect a large number of residents.
 {¶ 6} Bonnie Huston, another nurse who participated in the January 21st survey, documented the Tag F314 deficiency. Huston testified that she reviewed the records of Resident 32 ("resident"), a 76-year-old man, and discovered that he developed a pressure sore on his right ankle on or around September 6, 1999. Apparently, the resident had been ill and bedridden for a substantial period of time in early September.
 {¶ 7} On September 14, 1999, appellant assessed this resident at high risk for the development of additional pressure sores. Huston testified that, after this assessment, appellant should have developed and implemented a plan to prevent additional pressure sores. Appellant also should have followed its own skin care protocol for treatment and prevention of pressure sores for a high risk resident. These measures included: (1) observation of the resident's skin; (2) change of wet or soiled bed linens; (3) use of an egg crate mattress or air mattress (pressure relieving devices); (4) turning the resident every two hours; (5) range of motion; and (6) proper nutrition and hydration.
 {¶ 8} However, Huston testified that the resident's records indicated that, on October 7, 1999, the resident developed another pressure sore, this time on his left hip. Huston found no indication in the resident's records that appellant followed its skin care protocol or took any preventative measures to stop the development of new pressure sores after his September 14th high-risk assessment. The resident's main care plan did not mention his skin care problem. Nor did the resident's record reflect an episodic care plan to prevent additional pressure sores. Therefore, Huston concluded that the pressure sore on the resident's left hip was avoidable.
 {¶ 9} Huston also reviewed the nursing notes for this resident from September 14, 1999 through October 6, 1999. Nursing notes record care delivered to a resident, as well as nurses' observations of the resident's physical condition and behavior. Huston testified that the nursing notes did not indicate the use of pressure relieving devices, such as an egg crate pad or waffle mattress for this resident, until October 6, 1999. On that day, there was a notation indicating the placement of an egg crate mattress on the resident's bed. Huston also reviewed the physician's orders for the resident during the same time period. There were only two notations in the physician's orders relating to the resident's pressure sores, one indicating an order for an antibiotic shot into his right ankle, and one dated October 6, 1999, for the placement of an egg crate mattress on the resident's bed. Huston also testified that she saw no evidence in either the nursing notes or the physician's orders that the resident ever refused a pressure-relieving device.
 {¶ 10} On cross-examination, Huston acknowledged that the resident suffered from anemia, which would affect the skin's ability to heal itself. She also admitted that the resident had refused to eat during September and that the intake of protein was a critical component in maintaining the skin's integrity. Additionally, in early September, Huston indicated that the resident had significant behavioral problems, including taking off his clothes and taking the sheets off of his bed.
 {¶ 11} Karen Kuck, a reviewer with appellee's Bureau of Regulatory Compliance, testified regarding the imposition of the CMP. Her job was to review statements of deficiencies and recommend remedies for those deficiencies. In this case, she recommended the immediate imposition of a CMP in the amount of $350 per day of non-compliance. She testified that immediate imposition of a CMP is recommended when a facility had been cited on a previous standard survey for a "G" level deficiency. Kuck noted that appellant was cited in its last standard survey, on October 22, 1998, for another Tag F314 level "G" deficiency. Therefore, Kuck recommended the immediate imposition of the CMP. In calculating the amount of the CMP, Kuck stated she followed federal regulations, which take into account the seriousness of the deficiency, the facility's history of compliance, the facility's financial condition, and the facility's degree of culpability. Section 488.438(f), Title 42, C.F.R.; see, also, R.C. 5111.49.
 {¶ 12} Amy Stine and Tanya Crouse both testified concerning the standard survey they conducted of appellant's facility on October 22, 1998. They testified that appellant was cited in that survey for a Tag F314 deficiency involving the failure to prevent or treat pressure sores on two residents. Section 483.25(c), Title 42, C.F.R. Both of these residents developed pressure sores after it was determined that they were at high risk for developing such conditions.
 {¶ 13} Appellee's final witness was Alan Curtis, the Chief of the Bureau of Regulatory Compliance. Curtis approved Kuck's decision to impose a $350 per day CMP. He explained that a CMP is used to encourage facilities to make corrections and to come into substantial compliance as soon as possible. A CMP normally begins to run on the survey date. The CMP remains in effect until the facility comes into substantial compliance with the regulations.
 {¶ 14} Appellant's first witness was Judy Taylor, a nurse and appellant's care plan coordinator. Taylor described the resident as having significant behavioral problems. She also testified that September 1999 was a bad time for the resident, as he went through a major change in his daily activities and was very uncooperative and combative with the staff. Taylor also testified that the resident lost a considerable amount of weight in early September.
 {¶ 15} Taylor described the acute or episodic care plan developed for the resident. The first entry in his care plan was dated September 7, 1999, and indicated that the resident developed a sore on his right ankle. The care plan required the nurses to treat the resident as directed by the physician and to monitor the resident's nutritional status and position while in bed. The next entry in chronological order was dated September 9, 1999, and indicated that the sore on the resident's ankle was healing and that treatment should be continued according to the treatment sheet. On September 16, 1999, another entry indicated that the sore on the resident's ankle continues and that no real improvement was shown. On September 30, 1999, an entry indicated that the sore remained on the resident's right ankle, but that it was healing well. Then, in an entry dated October 7, 1999, it was noted that the resident had another area on his left hip surrounded by persistent redness. The plan requested the area be cleansed with water and ointment applied. Taylor testified that, before this October entry, an egg crate pad was put on the resident's bed, but he would not leave the pad on. This was a period of time when the resident was exhibiting behavioral problems, such as taking off his clothes and removing his bed linens. She stated that the resident tore up three or four egg crate pads during this period of time.
 {¶ 16} On cross-examination, Taylor testified that, once a resident is assessed as being at high risk for developing pressure sores, appellant takes steps to prevent them. In this case, Taylor referred back to the acute care plans and noted that the resident's nutrition and bed positioning were being monitored. Although she testified that appellant attempted to use egg crate mattresses in early September, she could find no entry in any of the resident's records indicating that egg crate or waffle mattresses were placed on the resident's bed in September 1999. She did note an entry in the resident's treatment notes, which indicated that an egg crate pad was put on the resident's bed on October 6, 1999. Taylor testified that this entry was made because the resident was cooperative and finally allowed the egg crate pad to remain on his bed. Prior to October 6, 1999, Taylor stated the resident would consistently strip his bed and shred the egg crate pads. When asked if there was documentation substantiating that the resident had refused or destroyed the egg crate pads, Taylor could only point to entries in the nurse's notes which indicated that the resident refused to keep bed clothes on and pulled linens off his bed.
 {¶ 17} Taylor admitted that the first time an egg crate pad was ordered by a physician was October 6, 1999. She also testified that there was never an acute or short-term care plan developed for the resident after he was assessed at high risk for pressure sores on September 14, 1999. Although Taylor stated that pressure relieving devices were part of appellant's skin care protocol, she admitted that the records did not indicate the protocol was followed prior to October 6, 1999.
 {¶ 18} Patricia Twinam, the facility's housekeeping supervisor, testified that part of her job is to assist nurses in keeping track of the facilities' egg crate mattresses. She stated that the resident had egg crate mattresses put on his bed in September 1999, and that they had to be replaced several times after he tore them up. She further testified that, at one point, they changed from an egg crate pad to a waffle mattress to see if the resident would leave it on his bed. She stated that, every time she made the resident's bed, an egg crate mattress would be put on the bed. On cross-examination, Twinam admitted that she kept notes regarding the residents but did not bring them to the hearing.
 {¶ 19} Jennifer Lovett, the facility's director of nursing since 2000, testified that the nurses tried everything they could to prevent additional sores but that the resident was not cooperative and that the pressure sore was unavoidable. On cross-examination, Lovett admitted that the development of a pressure sore, or a high-risk assessment for pressure sores, should lead to the development and implementation of an acute care plan. She also agreed that, if a resident tears his linens off his bed ten times a day, the linens must be replaced each time. Finally, Lovett testified that anything of note that the nurses observe or do for a resident must be documented, because, if it is not documented, it did not happen. A refusal of care should be documented as well.
 {¶ 20} After the hearing, the hearing examiner issued a report including findings of fact, conclusions of law, and a recommendation. The hearing examiner concluded that appellee proved that appellant violated the quality of care requirement found in Section 483.25(c), Title 42, C.F.R. and that the development of the resident's October 7, 1999 pressure sore was avoidable. The hearing examiner also concluded that the CMP was reasonable and lawful. The hearing examiner found reliable, probative and substantial evidence to support the deficiency finding and recommended the imposition of the CMP. Appellee accepted the hearing examiner's recommendation and imposed the CMP in the amount of $9,800.
 {¶ 21} On appeal to the Franklin County Court of Common Pleas, the court affirmed the deficiency finding but modified the amount of the CMP. The court determined that the CMP should reflect the number of days the deficiency existed. The court found this period to be from the time of the high-risk assessment, September 14, 1999, through the time preventative measures were noted on October 6, 1999 — a total of 22 days. This modification reduced the amount of the CMP to $8,050.
 {¶ 22} Appellant appeals, assigning the following assignment of error:
 THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND THE OHIO DEPARTMENT OF HEALTH'S ADMINISTRATIVE DETERMINATION WAS SUPPORTED BY RELIABLE, PROBATIVE AND SUBSTANTIAL EVIDENCE AND WAS IN ACCORDANCE WITH THE LAW.
 {¶ 23} In an administrative appeal pursuant to R.C. 119.12, the trial court reviews an order to determine whether it is supported by reliable, probative and substantial evidence and is in accordance with law. Huffman v. Hair Surgeon, Inc. (1985), 19 Ohio St.3d 83, 87. Reliable, probative and substantial evidence has been defined as follows: "(1) `Reliable' evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) `Probative' evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) `Substantial' evidence is evidence with some weight; it must have importance and value." Our Place, Inc. v. OhioLiquor Control Comm. (1992), 63 Ohio St.3d 570, 571.
 {¶ 24} On appeal to this court, the standard of review is more limited. Unlike the court of common pleas, a court of appeals does not determine the weight of the evidence. Rossford Exempted Village SchoolDist. Bd. of Edn. v. State Bd. of Edn. (1992), 63 Ohio St.3d 705, 707. In reviewing the court of common pleas' determination that the commission's order was supported by reliable, probative and substantial evidence, this court's role is limited to determining whether the court of common pleas abused its discretion. Roy v. Ohio State Med. Bd. (1992),80 Ohio App.3d 675, 680. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore(1983), 5 Ohio St.3d 217, 219. However, on the question of whether the commission's order was in accordance with law, this court's review is plenary. Univ. Hosp., Univ. of Cincinnati College of Medicine v. StateEmp. Relations Bd. (1992), 63 Ohio St.3d 339, 343.
 {¶ 25} Nursing facilities must substantially comply with Section 483.25, Title 42, C.F.R. which regulates the quality of care residents receive. In pertinent part, that regulation provides that:
 (c) Pressure sores. Based on the comprehensive assessment of a resident, the facility must ensure that —
 (1) A resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and
 (2) A resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing.
 {¶ 26} It is uncontested that the resident developed a pressure sore on or around September 6, 1999, and was assessed at high risk for the development of additional pressure sores on September 14, 1999. It is also uncontested that the resident developed another pressure sore on October 7, 1999. The only issue is whether or not the second pressure sore was unavoidable. Appellant contends that this second pressure sore was unavoidable due to the resident's clinical condition in September 1999, and the resident's own decisions to: (1) refuse care; (2) refuse to eat; (3) refuse hydration; (4) refuse and destroy pressure relieving devices such as egg crate pads and waffle mattresses; and (5) remove his clothes and bed linens. Appellee contends that the second pressure sore was avoidable if appellant had followed its skin care protocol and had utilized pressure relieving devices, such as an egg crate pad or waffle mattress on the resident's bed.
 {¶ 27} To establish a prima facie deficiency under this regulation, appellee must establish that a resident developed a pressure sore after admission. Meadow Wood Nursing Home v. Centers for Medicare Medicaid Services (Jan. 28, 2002), U.S. Dept. of Health Human Services, Departmental Appeals Board, Docket No. C-99-271, Decision No. CR 862. Here, it is not contested that the resident developed a pressure sore on October 7, 1999, after his admission to the facility and after his high-risk assessment for pressure sores. Therefore, the burden then shifts to appellant to demonstrate that the pressure sore was unavoidable. Appellant must show that it furnished the care necessary to prevent new sores unless they were unavoidable. Koester Pavilion v. HealthCare Financing Administration (Oct. 18, 2000), U.S. Dept. of Heath 
Human Services, Departmental Appeals Board, Docket No. A-2000-69, Decision No. 1750; Rose Care Center of Little Rock v. Centers forMedicare Medicaid Services (Sept. 4, 2001), U.S. Dept. of Heath Human Services, Departmental Appeals Board, Docket No.C-98-369, Decision No. CR 814.
 {¶ 28} The common pleas court determined that there was reliable, probative and substantial evidence to support the hearing examiner's conclusion that the resident's pressure sore was avoidable because appellant did not have a proper preventative plan in place and did not take the necessary steps to prevent the formation of new pressure sores. This determination was not an abuse of discretion.
 {¶ 29} It is clear that the facility monitored this resident after his high-risk assessment on September 14, 1999. However, the key factual issue is what appellant did or did not do to prevent new pressure sores after September 14, 1999. Appellant must demonstrate that it furnished what was necessary to prevent a new sore from developing. KoesterPavilion, supra. Appellant presented testimony that its nurses attempted to place pressure relieving devices on the resident's bed many times in September only to have them destroyed by the resident. However, the resident's records indicate that appellant only monitored the resident and failed to provide any pressure relieving devices until after the second pressure sore developed. Although the resident's records do contain notations from September 1999, describing the resident's behavioral problems, those entries do not reference the use of any pressure relieving devices. Entries reflecting appellant's use of pressure relieving devices are dated after October 6, 1999. The administrative body had the opportunity to observe the demeanor of the witnesses and weigh their credibility. Univ. of Cincinnati v. Conrad (1980),63 Ohio St.2d 108, 111; Suso v. Ohio Dept of Dev. (1993),93 Ohio App.3d 493, 504.
 {¶ 30} There was reliable, probative and substantial evidence indicating that appellant did not do all that was necessary to prevent the resident's pressure sore because it failed to provide the resident with pressure relieving devices after he was assessed at high risk for pressure sores. Therefore, the common pleas court did not abuse its discretion in affirming the hearing examiner's determination that the resident's October 7, 1999 pressure sore was avoidable.
 {¶ 31} Appellant also argues that appellee's surveyors failed to consider state certification laws, specifically R.C. 5111.41, in conducting their survey of appellant's facility. We disagree. The testimony appellant cites does not support appellant's contention; rather, Huston testified that she applied both federal and state standards in conducting her survey of appellant's facility.
 {¶ 32} Even assuming the surveyors did not expressly apply R.C.5111.41, the requirements of that section have been satisfied. R.C.5111.41(A) provides that a finding of non-compliance shall be cited as a deficiency only if the non-compliance cannot be justified by either: (1) the actions, practices, situations, or incidents resulted from a resident exercising the resident's rights guaranteed under the laws of the United States or of this state; or (2) the actions, practices, situations, or incidents resulted from a facility following a physician's orders. Id.
 {¶ 33} Appellant's non-compliance cannot be justified under either criteria. As the hearing examiner determined, the evidence indicates that appellant did not take the necessary preventative steps by providing pressure relieving devices to the resident before the development of the second pressure sore. Nor did appellant refrain from the use of pressure relieving devices pursuant to physician orders.
 {¶ 34} If the non-compliance cannot be justified by either of the above, then the non-compliance shall be cited as a deficiency if any of the following apply:
 (1) The actions, practices, situations, or incidents could have been prevented by one or more persons involved in the facility's operation;
 (2) No person involved in the facility's operation identified the actions, practices, situations, or incidents prior to the survey;
 (3) Prior to the survey, no person involved in the facility's operation initiated action to correct the noncompliance caused by or resulting in the actions, practices, situations, or incidents;
 (4) The facility does not have in effect, if needed, a contingency plan that is reasonably calculated to prevent physical, mental, or emotional harm to residents while permanent corrective action is being taken.
R.C. 5111.41(B).
 {¶ 35} It is obvious that appellant's non-compliance could have been prevented by one or more persons involved in appellant's operation. Id. at R.C. 5111.41(B)(1). The resident was assessed at high risk for the development of pressure sores. As determined by the hearing examiner, if appellant had provided appropriate preventative measures and followed its own skin care protocol, the resident's second pressure sore could have been avoided. A nurse is authorized to take preventative measures, such as placing an egg crate mattress on a bed, without a physician's order. Any of appellant's nurses could have prevented the resident's pressure sore. Therefore, even assuming that the surveyor did not apply R.C.5111.41, the surveyor's finding of a deficiency still complied with that statute.
 {¶ 36} Finally, appellant contends that appellee improperly enhanced the CMP because there was not a repeat deficiency and there was no credible evidence regarding previous citations for pressure sores. We disagree. A CMP may be enhanced due to the existence of a repeat deficiency. R.C. 5111.49(A)(1)(g). A repeat deficiency is a deficiency cited pursuant to a survey, to which both of the following apply:
 (1) The finding or deficiency involves noncompliance with the same certification requirement, and the same kind of actions, practices, situations, or incidents caused by or resulting from the noncompliance, as were cited in the immediately preceding standard survey or another survey conducted subsequent to the immediately preceding standard survey of the facility. For purposes of this division, actions, practices, situations, or incidents may be of the same kind even though they involve different residents, staff, or parts of the facility.
 (2) The finding or deficiency is cited subsequent to a determination by the department of health that the finding or deficiency cited on the immediately preceding standard survey, or another survey conducted subsequent to the immediately preceding standard survey, had been corrected.
R.C. 5111.35(L) (emphasis added).
 {¶ 37} Appellant first contends that the January 2000 deficiency was not a repeat deficiency because appellant had been surveyed in August and November 1999, after the October 1998 standard survey, and was not cited for pressure sore deficiencies in either of those surveys. Appellant argues that, because it was not cited for pressure sore deficiencies in the surveys immediately preceding the January 2000 survey, there could be no repeat deficiency. Again, we disagree. A repeat deficiency occurs if a deficiency based on the same certification requirement was cited in an immediately preceding standard survey or another survey conducted after that standard survey. It was not contested that the October 1998 survey was a standard survey of the facility, and both Tanya Crouse and Amy Stine testified that appellant was cited for pressure sore deficiencies in that survey. Although the facility's owner testified that appellee conducted two surveys of the facility in 1999, there was no evidence indicating that those were standard surveys. Therefore, the October 1998 survey was the immediately preceding standard survey and appellant was cited for the same deficiency that subsequently appeared in the January 2000 survey. Thus, appellant's January 2000 pressure sore deficiency was a repeat deficiency and appellee could properly enhance the CMP.
 {¶ 38} Lastly, appellant contends that there was no credible evidence of pressure sore deficiencies in the October 1998 survey. However, both Stine and Crouse testified regarding their personal observations and the documentation of those observations in the October 1998 statement of deficiencies. This statement of deficiencies also was admitted into evidence. Given the testimony of the two nurses who conducted the October 1998 survey, as well as the written statement of deficiencies, there was credible evidence of the pressure sore deficiencies in the October 1998 survey to justify a repeat deficiency enhancement of the CMP.
 {¶ 39} Appellee's deficiency finding and its decision to impose a CMP was supported by reliable, probative and substantial evidence, and the amount of the CMP was properly enhanced due to a finding of a repeat deficiency. Neither party contests the common pleas court's modification of the CMP amount. Accordingly, appellant's assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
 Judgment affirmed.
BOWMAN and DESHLER, JJ., concur.